**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


eClipse Enterprise
Solutions, LLC

    v.                          Civil No. 10-cv-547-LM

EndoCeutics, Inc.


**O R D E R**

After a jury trial, EndoCeutics, Inc. was found liable for
breaching its agreement with eClipse Enterprise Solutions, LLC
("eClipse") by failing to pay certain invoices and by failing to
participate in an electronic-data-capture ("EDC") trial.  For
the first breach, the jury awarded $42,984.48 in damages, and
for the second breach, it awarded $134,950 in damages.  The jury
also found that that eClipse did not breach the agreement.
Before the court are: (1) EndoCeutics's motion to amend
judgment, pursuant to Rule 59(e) of the Federal Rules of Civil
Procedure ("Federal Rules"), or, in the alternative, for
judgment as a matter of law under Rule 50, to which eClipse
objects; and (2) EndoCeutics's counterclaim that eClipse is
liable for violating New Hampshire's Consumer Protection Act
("CPA"), N.H. Rev. Stat. Ann. ("RSA") chapter 358-A, which was
tried to the court.  For the reasons that follow, EndoCeutics's

motion for post-verdict relief is denied, and eClipse is entitled to judgment on EndoCeutics's CPA claim.

### EndoCeutics's Motion for Post-Verdict Relief

A. The Legal Standard

When considering a motion for judgment as a matter of law under Rule 50, the court must "consider 'the evidence presented to the jury, and all reasonable inferences that may be drawn from such evidence, in the light most favorable to the jury verdict.'" Osorio v. One World Techs., Inc., 659 F.3d 81, 84 (1st Cir. 2011) (quoting Granfield v. CSX Transp., Inc., 597 F.3d 474, 482 (1st Cir. 2010); citing Cigna Ins. Co. v. Oy Saunatec, Ltd., 241 F.3d 1, 8 (1st Cir. 2001)).  Relief under Rule 50 may be granted only "if the facts and inferences point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have reached a verdict against that party." Osorio, 659 F.3d at 84 (quoting Santos v. Sunrise Med., Inc., 351 F.3d 587, 590 (1st Cir. 2003); citing Star Fin. Servs., Inc. v. Aastar Mortg. Corp., 89 F.3d 5, 8 (1st Cir. 1996)).

"Generally, to prevail on a Rule 59(e) motion [to amend a judgment], the moving party 'must either clearly establish a manifest error of law or must present newly discovered evidence.'"  Markel Am. Ins. Co. v. Díaz-Santiago, 674 F.3d 21,

2

32 (1st Cir. 2012) (quoting <u>FDIC v. World Univ. Inc.</u>, 978 F.2d
10, 16 (1st Cir. 1992); citing <u>Marie v. Allied Home Mortg.</u>
<u>Corp.</u>, 402 F.3d 1, 7 n.2 (1st Cir. 2005)).

### B. Discussion

EndoCeutics asks the court to rule that it did not breach
the agreement between itself and eClipse, and that eClipse did
breach the agreement, and is liable for damages.  In support of
that request, it raises three arguments: (1) the jury failed to
follow the court's instructions or improperly considered matters
outside the contract at issue; (2) counsel for eClipse made
improper statements during his closing argument; and (3) the
jury's award of damages is not supported by the evidence.
eClipse disagrees, categorically.  The court considers each
argument in turn.

### 1. Alleged Failure to Follow Jury Instructions

According to EndoCeutics, the jury necessarily failed to
follow the court's instructions, or improperly considered issues
outside the contract at issue, because there was no evidentiary
basis for two findings necessary to support its determination
that EndoCeutics breached its agreement with eClipse.
Specifically, EndoCeutics argues that if the jury had followed
the court's instructions and/or had limited its attention to the
issues properly before it, it could not have found that the

3

parties had agreed to waive the contract provision requiring
modifications to be in writing and had agreed to modify
eClipse's contractual obligation to use OpenClinica software.
The court does not agree.

On the issue of contract modification, the court instructed
the jury as follows:

> Obligations under a contract can be changed by
> either an express or an implied mutual agreement
> between the parties.  The written terms of a contract
> may be waived orally or by implication.  Whether the
> parties have agreed to change their obligations under
> a contract, or the terms of a contract, must be
> determined under the facts of each case.  Thus, where
> one party to a contract claims that the other party
> agreed to a modification of their contract, and the
> contract includes a clause requiring modifications to
> be in writing, the party claiming that the contract
> was modified must prove both an agreement to the
> modification itself and an agreement to waive the in-
> writing requirement.

Tr. (doc. no. 49), at 51-52.  Here, there was sufficient
evidence from which a reasonable jury could have concluded,
based on the course of dealing between Les Bihari and Lyne
Lavoie, that EndoCeutics had agreed both to waive the in-writing
requirement and to modify the substantive terms of the
agreement.  It is undisputed that the project milestones and
dates of completion set out in Section 4.0 were altered without
any written agreement by the parties.  Those multiple
alterations to the written terms of the contract are an implied
waiver of the in-writing requirement.  Moreover, there was

4

evidence at trial that the alterations eClipse made to the
OpenClinica code were made in response to requests from Lavoie
in order to achieve functionalities desired by eClipse that were
not possible with OpenClinica.  While there was testimony that
Lavoie had no authority to agree to contract modifications, and
did not realize that the functionalities she requested would
require a shift from off-the-shelf OpenClinica to eClipse's
proprietary version, a jury could have concluded that Bihari
reasonably understood Lavoie's communications to imply a
properly authorized agreement to modify the substantive terms of
the contract.  Accordingly, EndoCeutics's first argument does
not entitle it to the post-verdict relief it seeks.[1]

### 2. Statements by Counsel During Closing Argument

EndoCeutics next challenges the propriety of the following
portion of eClipse's closing argument:

> Okay.  I talked a lot about credibility, and I have
> one more topic that I want to address with you, and
> that is the fundamental concept of fairness . . .
>
> Is it fair now – I ask you as a jury **out here to
> determine fairness** – to now punish Les and eClipse for
> acting in what he thought was EndoCeutics best

---

[1] The court further notes that while EndoCeutics devoted
considerable attention at trial to hammering home the point that
eClipse had shifted from OpenClinica to its own software, it
seems not to have established that any such shift constituted a
material breach of the agreement.  That is, EndoCeutics did not
put on any evidence tending to show that eClipse's proprietary
software was different enough from OpenClinica to cause a
problem with the Food and Drug Administration ("FDA").

> interest?  Is it fair to punish him for something
> really that Lyne had asked him to do?  He should not
> be punished for following through with the requests of
> his customer.

Def.'s Mem. of Law (doc. no. 56-1), at 10 (quoting Tr. (doc. no.

49), at 35-36, emphasis added by EndoCeutics).  In other words,

EndoCeutics argues that it was "improper and highly prejudicial"

for eClipse to "set into the minds of the jury that this trial

[was] about determining what is 'fair' to eClipse and Mr.

Bihari, indeed, emphasizing [that] its very job [was] to

determine what is 'fair.'"  Id. at 10, 11.  eClipse's appeal to

fairness was prejudicial, in EndoCeutics's view, because it

encouraged the jury to resolve the case based on its sympathies

rather than by applying the relevant law to the facts it found.

EndoCeutics's argument, which it first raised at sidebar, is

still unconvincing.

     For one thing, eClipse's invocation of fairness was not an

appeal to some sort of freestanding concept of justice

untethered to the legal principles the jury was obligated to

employ.  Rather, eClipse's counsel asked the jury, rhetorically,

whether it was fair to punish eClipse for abiding by the

contract, as amended by Lavoie's various requests for

modifications.  Moreover, in the instructions given to the jury,

the concept of fairness was expressly linked to the jury's

obligation to apply the law:

> The principles of law set forth in these instructions
> are intended to guide you in reaching a fair and just
> result in this case, which is important to all the
> parties.  You are to exercise your judgment and common
> sense without prejudice and without sympathy, but with
> honesty and understanding.

Tr. (doc. no. 49), at 57-58.  Finally, the jury's obligation to

avoid basing its decision on sympathy was stated at several

points in the instructions it was given.  See id. at 44, 55, 58.

In sum, EndoCeutics's argument that the jury was improperly

influenced by an appeal to its sympathies is without merit.

### 3. Amount of Damages

EndoCeutics's final argument is that there was no evidence

to support an award of damages in any amount for its failure to

participate in eClipse's EDC trial.  EndoCeutics is mistaken.

According to EndoCeutics, "[t]here was no evidence that

eClipse lost a certain amount of profits, lost particular

prospects, or [suffered] any other damages as a direct result of

the breach."  Def.'s Mem. of Law, at 13.  To the contrary,

Bihari testified that eClipse absorbed the costs of providing

all the services described in Section 6.0 of its agreement with

EndoCeutics.  See Tr. (doc. no. 48), at 12.  Bihari also

testified that that the value of those services was $134,950.

See Tr. (doc. no. 50), at 58.  Lavoie testified that EndoCeutics

did not ultimately use the Clintrial metadata library that

eClipse created, see Tr. (doc. no. 48), at 106, and Claude Dore

7

testified to similar effect, see Tr. (doc. no. 51), at 51.  But neither Lavoie nor Dore testified that eClipse did not provide EndoCeutics with that product.  Lavoie and Dore both testified that EndoCeutics received only an hour or two of the end-user training that eClipse valued at $15,000, see Tr. (doc. no. 48), at 107; Tr. (doc. no. 51), at 51, but Bihari testified that eClipse provided all of the training described in the agreement, see Tr. (doc. no. 48), at 12.  Dore further testified that eClipse provided only one session of site end-user training (valued at $3,000) and no UAT consulting and support (valued at $26,250).  See Tr. (doc. no. 51), at 52.  The jury, however, was entitled to credit Bihari's testimony over Lavoie's and Dore's.  To be sure, eClipse's evidence on damages is not particularly strong, but, it is sufficient to support the jury's award.

### EndoCeutics's CPA Claim

Count Four of EndoCeutics's counterclaim asserts that eClipse willfully and knowingly violated the Consumer Protection Act.  That claim was tried to the court, and EndoCeutics has submitted proposed findings of fact and rulings of law, see doc. no. 55, to which eClipse has not responded.  eClipse is entitled to judgment on EndoCeutics's CPA claim.

The New Hampshire CPA makes it "unlawful for any person to use any unfair method of competition or any unfair or deceptive

act or practice in the conduct of any trade or commerce within
this state." RSA 358-A:2.  The statute includes a non-exclusive
listing of fourteen prohibited acts.  See RSA 358-A:2, I-XIV.
"In determining which commercial actions not specifically
delineated are covered by the act, [the New Hampshire Supreme
Court has] employed the 'rascality' test." George v. Al Hoyt &
Sons, Inc., 162 N.H. 123, 129 (2011) (citing State v. Sideris,
157 N.H. 258, 263 (2008)).  "Under the rascality test, the
objectionable conduct must attain a level of rascality that
would raise an eyebrow of someone inured to the rough and tumble
of the world of commerce." George, 162 N.H. at 129 (citing ACAS
Acqs. (Precitech) Inc. v. Hobert, 155 N.H. 381, 402 (2007)).  In
its proposed findings of fact and rulings of law, EndoCeutics
relies on the rascality test and describes its CPA claim by
arguing that

> [t]he evidence in this matter demonstrated, by a
> preponderance of the evidence, that eClipse (1)
> devised a plan well before the Agreement in this
> matter to create its own proprietary software based
> off of OpenClinica; (2) contracted with EndoCeutics to
> use OpenClinica; (3) continuously represented that it
> was using OpenClinica; and (4) instead, created a new
> software without EndoCeutics knowledge or consent.

Def.'s Proposed Findings & Rulings ¶ 14.

EndoCeutics has not proven its CPA claim by a preponderance
of the evidence.  EndoCeutics makes much of Bihari's testimony
that eClipse intended, from the outset, to create its own

proprietary software, and appears to argue that eClipse kept

that intention to itself, to EndoCeutics's detriment.  However,

Section 1.0 of the agreement expressly provides that "[u]pgrades

of OpenClinica will be covered under the hosting provisions of

this document," Pl.'s Ex. 1, at 4.  Moreover, under Section 2.0

of that agreement, EndoCeutics, "[a]s a participant [in] the

eClipse EDC partner program . . . agree[d] to: . . .

[c]ollaborate with eClipse in the development of the EDC service

[by] offering providing feedback on the offering['s]

effectiveness, OpenClinica's functionality and describe[ing]

necessary areas of improvement," id. at 5.

Because the prospect of upgrading and improving OpenClinica

was plainly stated in the agreement between eClipse and

EndoCeutics, EndoCeutics has not proven that eClipse engaged in

some kind of a "bait-and-switch" by promising to use "pure"

OpenClinica while secretly planning to spring some completely

different EDC program on EndoCeutics.  And, while Lavoie

testified that she was not aware that any of the functionalities

she requested from Bihari would result in alterations to

OpenClinica, the contract plainly contemplated "[u]pgrades to

OpenClinica," which necessarily included alterations to the

program, and required EndoCeutics to provide feedback describing

areas in which OpenClinica needed improvement.

Beyond that, EndoCeutics's claim does not make common sense.  eClipse's whole point in providing EndoCeutics with more than $135,000 in unbilled services was to exchange those services for an endorsement from EndoCeutics.  Knowing full well the purposes behind EndoCeutics's clinical trials, i.e., FDA approval, and presumably targeting similarly situated pharmaceutical companies seeking to conduct similar clinical trials, it would make no sense for eClipse to provide EndoCeutics with an EDC protocol that would not satisfy the FDA. As noted, other than proving that the EDC program eClipse built off OpenClinica is different from OpenClinica, and has a different name, EndoCeutics did not offer any evidence that eClipse's new OpenClinica-based EDC program would not satisfy FDA requirements.  And, rather than exploring that issue with eClipse, EndoCeutics simply canceled the agreement in a way that can only be characterized as precipitous.  The court has already addressed EndoCeutics's argument that eClipse created new software without its knowledge or consent; evidence introduced at trial supports a finding that the alterations eClipse made to OpenClinica were made with EndoCeutics's knowledge and at its request.

It may well be that there were some miscommunications and misunderstandings between eClipse and EndoCeutics as the contracted project unfolded.  But, eClipse's intention to use

the project as a clinical trial for its own application of
OpenClinica could not have been more clearly expressed in the
agreement, which made it nonsensical for eClipse to have
provided EndoCeutics with a product which, necessarily, would
have inspired EndoCeutics to give a highly critical reference.
In sum, EndoCeutics has not proven, by a preponderance of the
evidence, that eClipse engaged in conduct "that would raise an
eyebrow of someone inured to the rough and tumble of the world
of commerce." <u>George</u>, 162 N.H. at 129.  Accordingly, eClipse is
entitled to judgment on EndoCeutics's CPA claim.

### Conclusion

For the reasons detailed above, eClipse is entitled to
judgment on EndoCeutics's CPA claim, and EndoCeutics's motion
for post-verdict relief, document no. 56, is denied.  The clerk
of the court shall enter judgment in accordance with this order
and close the case.

SO ORDERED.

_____
Landya McCafferty
United States Magistrate Judge

August 27, 2012
cc: Susan Aileen Lowry, Esq.
    Philip L. Pettis, Esq.
    Arnold Rosenblatt, Esq.